# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN GROSS AND COMPANY, INC., individually and on behalf of all those similarly situated,<br><br>                    Plaintiff,<br>v.<br><br>AGRI STATS, INC., CLEMENS FOOD GROUP, LLC, HORMEL FOODS CORPORATION, INDIANA PACKERS CORPORATION, JBS USA, SEABOARD FOODS, LLC, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC, AND TYSON FOODS, INC.,<br><br>                    Defendants. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Gross and Company, Inc. ("Plaintiff") files this civil action pursuant to Section 1 of the Sherman Act, Section 4 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for damages, costs of suit, injunctive relief and other relief as may be just and proper, on behalf of itself and classes of those similarly situated ("Class" as defined below) against defendants Agri Stats, Inc., Clemens Food Group, LLC, Hormel Foods Corporation, Indiana Packers Corporation, JBS USA, Seaboard Foods, LLC, Smithfield Foods, Inc., Triumph Foods, LLC, and Tyson Foods, Inc. (collectively "Defendants"), for their conspiracy to restrain the domestic supply of pork, so as to raise pork prices to Plaintiff and members of the Class.

Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows.

1.    Defendants other than Agri Stats, Inc. (collectively the "Pork Producer Defendants") are the leading sellers of pork in an industry with over $20 billion in domestic annual revenue. The domestic pork industry is highly concentrated, with a small number of large producers controlling supply. The Pork Producer Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

2.    Defendants, Agri Stats, Inc. (Agri Stats), Clemens Food Group, LLC (Clemens), Hormel Foods Corporation (Hormel), Indiana Packers Corporation (Indiana Packers), JBS USA, Seaboard Foods LLC (Seaboard), Smithfield Foods, Inc. (Smithfield), Triumph Foods, LLC (Triumph), and Tyson Foods, Inc. (Tyson), entered into a conspiracy no later than 2009, through to the present, to fix, raise, maintain and stabilize the price of pork.[1] The principal (but not exclusive) method by which the Pork Producer Defendants implemented and executed their conspiracy was by coordinating their output and limiting production, with the intent and result of raising pork prices. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and otherwise closely guarded non-public information regarding their prices, capacity, sales volume and demand through co-conspirator Agri Stats.

---

[1] For the purposes of this Complaint, "pork" includes pig meat in all its forms, sold fresh or frozen, including smoked ham, sausage and bacon.

3.    Beginning no later than 2009, Agri Stats provided "benchmarking" reports to the Pork Producer Defendants, among others. Such reports generally allow competitors to compare their respective profits and performance. But Agri Stats' reports are far more detailed than legal benchmarking reports. Agri Stats gathers detailed financial and production data from each of its pork producer customers, standardizes this information, and produces customized reports and graphs. The details in these reports are not the type of information that competitors would share in a competitive market. They are more akin to the proverbial smoke-filled room of less sophisticated cartels of the distant past.

4.    In both weekly and monthly reports, Agri Stats provides its pork producer customers with otherwise confidential current and forward-looking information (including profits, costs, prices and slaughter information), all in such a way as to enable its customers to identify the sources of that data (i.e., its customers' respective competitors). An effect of this information exchange was to enable its customers to monitor each other's production and hence artificially control the supply and price of pork.

5.    The arrangement serves no conceivable valid and competitive purpose. It does, however, provide for an exceptionally effective enforcement mechanism for a price-fixing scheme. The data is current and forward-looking ,which courts consistently held has "the greatest potential for generating anticompetitive effects."[2] Second,

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

information contained in Agri Stats reports is specific to identifiable companies. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[3] Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the co-conspirators to pay Agri Stats millions of dollars over the course of the conspiracy, a figure that far exceeds that of legitimate industry reports. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4] Agri Stats ensured that its information was available only to its co-conspirators, and not to Class members who might have used it against the Pork Producer Defendants.

6.    The Pork Producers admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that they would not raise their capacity.

7.    Defendants' conspiracy is further reflected in several "plus factors." Some of those are attributes specific to the pork industry that facilitate collusion, including substantial vertical integration, high barriers to entry, industry consolidation and concentration, inelastic demand, and a lack of significant substitutes for pork.

8.    The Pork Producer Defendants' restriction of the pork supply had the intended purpose and effect of artificially raising pork prices for Plaintiff and members of the Class. Beginning in 2009, the Pork Producer Defendants' profits increased. The prices

---

[3] *Id*. at 212.

[4] *Id*. at 213.

they charged were supracompetitive by virtue of their conspiracy. Plaintiff and members of the Class were injured by that conspiracy.

## JURISDICTION AND VENUE

9.   This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from Defendants' successful efforts to restrain trade in the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

10.  Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that affected the interstate trade and commerce discussed below has been carried out in this District.

11.  During the Class Period, Defendants sold pork in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

12.  This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b)

participated in selling pork throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an anti-competitive and otherwise illegal conduct that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

13. By reason of the unlawful conduct alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for pork, which unreasonably restrained trade and adversely affected the markets for pork.

14. Defendants' unlawful conduct described herein adversely affected persons and entities in the United States who purchased pork, including Plaintiff and the members of the Class.

## **PARTIES**

15. Plaintiff John Gross and Company, Inc. ("Plaintiff") is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania. Plaintiff purchased pork directly from one or more Defendants during the Class Period

and has been injured in his business or property by reason of Defendants' violations of law as alleged herein.

16. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator of the Pork Producer Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

17. Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the class period, Clemens and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18. Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. Hormel Foods is headquartered in Austin, Minnesota. During the Class Period, Hormel Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19. Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products. Indiana Packers is headquartered in Delphi, Indiana. During the Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20. JBS USA is one of the world's largest beef and pork processing companies and an indirect wholly owned subsidiary of Brazilian-based JBS SA. JBS USA is a wholly owned subsidiary of JBS USA Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21. Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22. Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest pork company in the world. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23. Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the class period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24. Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## CLASS ALLEGATIONS

25. Plaintiff brings this action on behalf of himself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a class (the "Class") defined as follows:

> All persons or entities who purchased pork directly from Defendants or their co-conspirators from January 1, 2009 through the present (the "Class Period").

26. Excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

27. The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable.

28. The Class is readily ascertainable and are ones for which records should exist, including, specifically, Defendants' records and transaction data.

29. Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and other Class Members have all sustained damage in that, during the Class Period, they purchased pork at artificially maintained, non-competitive prices, established by Defendants' actions in connection with the violations alleged herein.

30. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has purchased pork directly from one or more Defendants. Plaintiff has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class Members.

31. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. The common legal and factual questions, which do not vary among Class Members include, but are not limited to, the following:

- whether Defendants engaged in a conspiracy with each other to restrict the supply and raise the price of pork;

- whether Defendants' conduct is a per se violation of Section 1 of the Sherman Act;

- the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

• the effect of Defendants' conspiracy on the prices of pork sold in the United States during the Class Period;

• the identities of the Defendants involved in the conspiracy; and

• the appropriate class-wide measure of damages.

32. A class action is superior to any other method for the fair and efficient adjudication of these issues, as joinder of all members is impracticable. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## FACTUAL BACKGROUND

33. Starting no later than 2009 and continuing to the present, Defendants conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their price-fixing agreement, Defendants relied on a unique industry data sharing service known as Agri Stats. Agri Stats provided a means for the Pork Producer Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

11

## Agri Stats' Role in Collusion in the Broiler Chicken Industry

34.  Agri Stats has played a central role in other industries, including collusion in the broiler chicken industry.[5] As alleged in *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.), the broiler producers used Agri Stats to facilitate their conspiracy to restrain production and artificially raise prices.

35.  In the broiler chicken industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

36.  The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The *Broiler Chicken* complaints allege it was

---

[5] Broiler chickens are bred and raised to be slaughtered before the age of 13 weeks for sale in the poultry market.

common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

37.  Plaintiffs in the *Broiler Chicken* case further allege that Agri Stats – known to its co- conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

38.  The district court noted, in denying the motions to dismiss in the In re Broiler Chicken Antitrust Litigation that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[6]

---

[6] Memorandum Opinion and Order at 11, In re Broiler Chicken Antitrust Litigation, No. 16- cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541

### Agri Stats' Marketed its Scheme to the Other Defendants

39.  Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the pork industry along the lines of the benchmarks used to restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies. Benchmarking, of the type undertaken by Agri Stats and its co- conspirators here, reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information between competitors.

40.  In 2008, Greg Bilbrey of Agri Stats told pork industry producers that "[b]enchmarking in the pork industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial pork operation is encouraged to participate in some benchmarking effort."

41.  Agri Stats emphasized to pork producers that the goal of the conspiracy (and the agreement to share information) was profitability, not production, and invited pork producers again, to participate in the benchmarking. Agri Stats emphasized that "We must remember that the ultimate goal is increasing profitability – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach pork production company should be participating in some type of benchmarking. To gain

maximum benefit, production, cost and financial performance should all be part of the benchmarking program."

42.  In April 2009, Agri Stats again invited pork producers to design and operate their own benchmarking effort. Greg Bilbrey of Agri Stats invited pork producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. Producer groups could design and operate their own benchmarking effort."

43.  Total pork sales in the United States during a portion of the Class Period were as follows:

| Year | Sales |
|------|-------|
| 2016 | $18.9 billion |
| 2015 | $21.0 billion |
| 2014 | $26.4 billion |
| 2013 | $23.4 billion |

44. Each defendant's annual sales of pork products are also immense. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has enormous consequences to profits.

**Agri Stats Provided Its Co-Conspirators with Unlimited Ability to Police the Agreement**

45.  Agri Stats provided its co-conspirators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation and continuing stability of the Defendants' price-fixing scheme. To organize an effective price-fixing agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats' participation served as that monitoring function.

46.  Each member of the conspiracy, including pork integrators and defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers. In fact, Agri Stats' parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.

47.  Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way.

48.  Participants in the scheme would then receive monthly detailed reports and graphs that allow them to compare their performance and costs to that of their co-conspirators, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported.

49. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. Participants may also receive an abbreviated Key Performance Indicator report, as well as, historical graphs.

50. Due to the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

51. The Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (CKG refers to 100 kilograms.) This demonstrates that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was to  facilitate a conspiracy which would increase the profitability of the defendant companies and the create higher sales prices.

52.  Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any consumer benefits. Exchanging individual company data (particularly current data on prices and costs), is not required to achieve major efficiencies.

53.  Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors.

54.  Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "[A]gree on calculation and data collection procedures," they must "[d]etermine **tolerance and outlier status and enforce**," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "**[e]ach participant has to commit**."

55.  To ensure compliance with the rules, Agri Stats' account managers would conduct on-site live reviews to assist with report utilization and analysis. The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on the size and other factors. A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "**the ultimate goal is increasing profitability-**

***not simply increasing level of production."*** In May 2015Express Markets , a subsidiary

of Agri Stats,  announced that it was adding its market analysis of pork to their product

offerings in order to meet the broad information and knowledge needs of its customers.[7]

56.  By providing detailed production statistics by producer, Agri Stats allowed

each member of the conspiracy to monitor each other's ongoing adherence to agreed-

upon plans for coordinated production limits. Critically, Agri Stats provided forward-

looking data that allowed the co-conspirators to determine each other's future production

in addition to their current production.

57.  Agri Stats reports are organized by company and facility, but the producers'

names are not listed in the reports. While theoretically anonymous, the reports contain

such detailed figures covering every aspect of pork production and sales that producers

can accurately identify the companies behind the metrics. For example, long-time

industry insiders are sufficiently familiar with each other to identify unique but recurring

data points for other companies, as well as identify the other companies by general

metrics and size.

58.  Moreover, Agri Stats knew that the anonymity of its system was compromised

by individuals who had gleaned knowledge of competitors' identification numbers, but

reassigning numbers was an arduous undertaking the company was not eager to embark

on.

---

[7] Again, taking a page from the broiler industry playbook, where Express Markets provided
extensive pricing reports in 2003.

59.  Suppliers received as many as one dozen books of data at the end of each quarter, augmented by monthly update books featuring the latest year-to-date information.

60.  Within these monthly books, each Supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

61.  Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Despite knowing about this practice, employees at Agri Stats did nothing to fix the problem.

62.  Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring

function, allowing each member of the cartel to police each other's production figures
(which were trustworthy because they had been verified) for signs of cheating.

63.  In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the
broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former
> Justice Department antitrust lawyer who has studied Agri Stats while
> researching the modern poultry industry, casts the level of plant-by-plant
> detail in the company's reports as "unusual." He explains that information-
> sharing services in other industries tend to deal in averaged-out aggregated
> data—for example, insurance rates in a given state. Such services run afoul
> of antitrust law, he says, when they offer projections or provide data so
> detailed that no competitor would reasonably share it with another. Getting
> detailed information is a particularly useful form of collusion, Carstensen
> says, because it allows co-conspirators to make sure they're all following
> through on the agreement. "This is one of the ways you do it. You make
> sure that your co-conspirators have the kind of information that gives them
> confidence—so they can trust you, that you're not cheating on them," he
> says. "***That is what creates stability for a cartel***."

### Defendants' Scheme was Facilitated by Their Vertical Integration

64.  The pork production industry is almost completely vertically integrated, with
four major producers controlling 75 percent of pork integration. Very large pork
producers are commonly characterized as "contractors" or "integrators" who contract
production of their hogs out to independent growers. Integration is so pervasive that
major producers are commonly called pork or swine integrators by the industry,
government, analysts and academics.

65.  In 2014, Smithfield had approximately 500 company-owned farms and
approximately 2,190 contract farms in the United States. Smithfield described its
arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

66. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. Smithfield's annual report highlights that, under these arrangements, the pork integrators pay only fixed service fees to the farmers, who bear all the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

67. Prior to, and in the beginning of the class period, the pork industry underwent a period of consolidation, resulting in a highly concentrated market. Between 1988 to 2015, the top four pork integrators (Smithfield, Tyson, JBS and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.

**Figure 1: Market Share of Top 8 Pork Integrators 1991 to 2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

68.  The hog production sector is similarly concentrated and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

69.  In July 2015, JBS USA announced it would be acquiring Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield. The acquisition, completed in October 2015, resulted in further consolidation in the industry.

70.  The resulting pork business had pro forma net revenue of approximately US$6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

71.  Barriers to entry keep competitors out of the pork packing industry. These barriers include but are not limited to (1) the costly and time-consuming process of  pork processing, (2) construction of a large-scale slaughter facility (3), design and permitting costs. For example, in 2012, it cost Cargill $25 million just to expand an **existing** facility. Building a new infrastructure from scratch would be considerably more.

72.  The concentration level in the pork industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork industry as "relatively mature and concentrated." Both factors – maturity and concentration – make the pork industry susceptible to collusion.

73.  The level of concentration in the pork industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers

were capable of independently controlling price through their own production, such an

agreement was necessary to inflate price.

**Pricing Patterns During the Class Period Reflect the Success of the Conspiracy**

74.  Beginning in 2009, the pork industry exhibited abnormal price movements.

According to aggregate prices published by the USDA, the hog market year average price

was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in

2015. The below graph highlights the unprecedented increase in pork prices beginning in

2009, and staying elevated through 2018:

**Figure 2: Average Hog Wholesale Prices in Cents per lbs., 2000-2018**



75.  Publicly available also demonstrates that during this period, whole price variation/risk was almost entirely shouldered by farmers, while the pork integrators' earnings increased steadily over the years 2009 to 2017, with a slight decline in 2017:

**Figure 3: Integrators and Farmers (Growers) Earning per Retail weight, 2000-2017**



### Defendants Restrained Capacity and Supply During the Class Period

76. As demonstrated in the following chart, at several points during the class period, the pork integrators acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production.[8] The decreases in production largely occurred after decrease in pork wholesale prices:

---

[8] While the conspiracy may be part of the reason for the production dip in 2014, it also reflects the negative impacts from the deadly pig disease, porcine epidemic diarrhea virus.

**Figure 4: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



77.  In public earnings calls, the Pork Producer Defendants were able to communicate with their co-conspirators, by making statements regarding their intentions to either stabilize or decrease supply (although gave false reasons for this stabilization). For example, in May 2009, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.

78. In May 2009, Hormel confirmed that "We see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

79. In June 2009, the CEO of Smithfield stated that the current cuts were not enough, and more were needed to "fix" the hog industry and that "Somebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.* We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

80. In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> *We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.* But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong.
> *But the answer is, yes, there are others cutting back. We're not the only one.*

81. In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield indicated that further cuts were still to come:

Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.

82.  The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield stated:

We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have***. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

Smithfield had access to competitively sensitive information from its competitors, through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

83.  That same month, the Associated Press reported the following as to Smithfield:

The company said profit margins on fresh pork prices rose in part because supplies have dropped in the United States. The company processed 13 percent fewer hogs than it did during the same period last year, in part because it closed a slaughterhouse in Sioux City, Iowa, in April.

While supplies have dropped, export demand has increased, firming up prices that had plummeted during the economic downturn that was compounded by a consumer scare over the pork flu outbreak, which both the industry and government said was unfounded.

"Supply and demand remained well in balance in the quarter. Reduced protein supplies, coupled with strong protein demand, supported record

high pork prices in all trade channels," CEO C. Larry Pope said in a statement.

As a result, live hog prices rose 54 percent compared to last year. Smithfield raises live hogs so it can benefit when prices rise. The company said it expects live hog prices to remain near their current level of roughly 54 cents a pound through 2011, and it expects a year of record net income, although it did not release a specific earnings forecast.

Associated Press Online, "*Smithfield posts profit, helped by pork business*," Dec. 9, 2010

(available on Lexis Advance).

84. Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer (COO) stated:

I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

That same month, the New York Times reported Tyson's increasing profits, and observed that "[t]he price that packers like Tyson receive for pork has risen about 30 percent in the last year as hog herds have shrunk, according to the Department of Agriculture."[9]

85. When asked, in the face of ever-increasing margins, whether the type of profits would continue, in March 2011, Smithfield publicly signaled to its competitors that it would not increase capacity, even in the face of the clear profitability:

LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I

---

[9] *Tyson's Profit Up on High Pork Prices and Cost Cuts*, N.Y. Times, Feb. 5, 2011 (available at https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9905E2D61538F936A35751C0A9679D8B63.html)

mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .

HEATHER JONES: So you are just striking a note of caution *because you know it can't stay this way indefinitely*; but it's not that you foresee this reversion to that norm over the near term?

BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe --

LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay. Thank you.

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing.. . . *And by the way, we are not going to build a new plant to expand capacity*.

86.  In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. *There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility*.

32

87. In July of 2017, CNBC.com reported that wholesale prices for pork bellies—prices paid by Plaintiff and members of the Class—had risen 71 percent since the start of the year. The report further observed that "U.S. Department of Agriculture figures showed December 2016 ended with the lowest supplies of pork bellies in cold storage during a December going back to when the department began tracking the number in 1957."[10]

## ANTITRUST INJURY

88. During the Class Period, Plaintiff and Class Members purchased pork. As a result of Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for pork than they would have absent that conduct, and thus suffered substantial damages. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

89. Because Defendants' unlawful conduct has successfully restrained competition in the market, Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificial, non-competitive prices for pork. The full amount of such damages will be calculated after discovery and upon proof at trial.

90. No procompetitive justification or effects outweigh the anticompetitive effects of Defendants' conduct.

---

[10] Jeff Daniels, *Bacon up more than 20 percent since January as wholesale pork belly prices soar*, July 8, 2017 (available at https://www.cnbc.com/2017/07/07/bacon-up-more-than-20-percent-since-january-as-wholesale-pork-belly-prices-soar.html)

91.  Plaintiff and Class Members are suitable plaintiffs for pursuing antitrust violations by Defendants, insofar as they purchased pork during the Class Period, and thus were harmed by Defendants' anticompetitive conduct.

92.  As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and Class Members have been injured in their business and property, in violation of federal antitrust laws. The injury to Plaintiff and Class Members is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

93.  Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their conspiracy. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding Defendants' efforts to restrain the supply and raise the price of pork, and could not reasonably discover Defendants' conduct.

94.  As alleged herein, Defendants' conduct was material to Plaintiff and Class members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were restraining the supply and raising the price of pork.

95.  Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were restraining the supply and raising the price of pork.

96.  Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment. Thus, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations.

## FIRST COUNT
### Violation of 15 U.S.C. § 1

97.  Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

98.  Defendants have conspired to fix prices in the relevant market in violation of Section 1 of the Sherman Act.

99.  As alleged above, Defendants entered into agreements with each other with the purpose and effect of unreasonably restraining trade and commerce in the relevant market.

100.   Defendants' conduct described above constitutes unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the relevant markets in violation of Section 1 of the Sherman Act.

101.    Defendants' conduct has no procompetitive benefit or justification. The anticompetitive effects of their conduct outweigh any purported procompetitive justifications.

102.    As a result of Defendants' conduct, and the harm to competition caused by that conduct, Plaintiff and Class Members have suffered substantial injuries to their business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

103.    Plaintiff and Class Members are also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members demand judgment as follows:

A.    Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

B.    That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and violate the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*;

C.    A judgment against Defendants for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.      By awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

E.      The costs of this suit, including reasonable attorney fees; and

F.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of himself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated:  June 29, 2018                          Respectfully submitted,

**CHESTNUT CAMBRONNE PA**

By s/ Karl L. Cambronne_____
    Karl L. Cambronne, #14321
    Bryan L. Bleichner, #0326689
    Jeffrey D. Bores, #227699
    17 Washington Avenue North, Suite 300
    Minneapolis, MN 55401
    (612) 339-7300
    kcambronne@chestnutcambronne.com
    bbleichner@chestnutcambronne.com
    jbores@chestnutcambronne.com

    Linda P. Nussbaum
    Bart D. Cohen
    Fred T. Isquith
    NUSSBAUM LAW GROUP, P.C.
    1211 Avenue of the Americas, 40th Floor
    New York, NY 10036-8718
    Telephone: (917) 438-9102
    lnussbaum@nussbaumpc.com
    bcohen@nussbaumpc.com
    fisquith@nussbaumpc.com

    *Counsel for Plaintiff and the Proposed Class*